United States Court of Appeals
Fifth Circuit

**F I L E D**

July 21, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-41165

RICHARD SCOTT SULLIVAN, JR.,

Plaintiff-Appellee,

VERSUS

COUNTY OF HUNT, TEXAS, ET AL.,

Defendants.

PHILLIP KILLGORE, Individual and official capacity; GARY
COLLINS, Individual and official capacity; JERRY MCRAE,
Individual and official capacity,

Defendants-Appellants.

Appeals from the United States District Court
For the Eastern District of Texas
5:01-CV-23

Before DAVIS, BENAVIDES and PRADO, Circuit Judges.

DAVIS, Circuit Judge.[*]

Plaintiff, Sullivan, a former game warden with the Texas Parks
and Wildlife Department (TPWD) filed this suit against two of his

---

[*]Pursuant to 5ᵀᴴ Cɪʀ. R. 47.5, the Court has determined that this
opinion should not be published and is not precedent except under
the limited circumstances set forth in 5ᵀᴴ Cɪʀ. R. 47.5.4.

supervisors, Gary Collins and Jerry McRae, and the Chief Deputy Sheriff of Hunt County, Texas, Phillip Killgore, under § 1983. He also asserted pendent state law claims. The suit seeks damages arising out of an incident in which Deputy Killgore directed his officers to take Sullivan into custody for a mental evaluation based on Killgore's belief that Sullivan was suicidal and a danger to himself. The defendants moved for summary judgment based on qualified immunity which the district court denied based on its conclusion that questions of fact were presented. After a careful review of the record, we find no issues of fact presented and reverse the district court's order denying qualified immunity.

I.

At the time of the incident in question, Sullivan had been employed as a game warden for the TPWD for approximately four years. Sullivan's immediate TPWD supervisor was defendant Collins, who in turn was under the supervision of defendant McRae. On June 20, 2000, plaintiff found his fiancé, Rhonda Farber, dead in the bathroom of his house where the two of them lived. Plaintiff had spent the night of June 19 next door, at his mother's home. Ms. Farber had apparently committed suicide with plaintiff's service revolver.

## II. The Claims Against Killgore

### A.

The dispatcher for the Hunt County Sheriff's Office notified

2

the deputies on duty, including Chief Deputy Killgore, that Sullivan's family was concerned that he would harm himself. When Killgore arrived at Sullivan's home, several deputies were there already. He took charge of the deputies on the scene and, as explained below, eventually ordered that Sullivan be taken into custody for a mental examination.

Based upon our review of the record we are satisfied that the following undisputed facts demonstrate that before Killgore ordered Sullivan detained, a reasonable officer in Chief Deputy Killgore's position would have had probable cause to believe that Sullivan was a suicide risk and therefore a danger to himself:

1. The day before Sullivan's seizure, Sullivan discovered that his fiancé, Rhonda Farber, had shot herself with Sullivan's service revolver in the bathroom of Sullivan's home.

2. Chief Deputy Killgore and other Hunt County Sheriff's Office personnel investigated this suicide. Killgore knew Sullivan and knew of his relationship with Ms. Farber and his distress over her tragic death.

3. The next day plaintiff and his father went to the plaintiff's house to clean the bathroom where Ms. Farber had committed suicide. Sullivan's sister became concerned about her brother's emotional state and dialed 911. The evidence is in dispute about what Sullivan's sister said to the 911 operator. However, it is undisputed that the

3

911 operator contacted the Hunt County Sheriff's Office and advised that plaintiff's family reported that Sullivan had returned to the scene of the suicide and that they feared that he would harm himself. The 911 operator relayed this information to the Hunt County Sheriff's Office dispatcher and Killgore received essentially this same information from the dispatcher. Several officers at the scene reported to Killgore that Sullivan's sister and mother were telling the officers that they were concerned for Sullivan's safety. Although Sullivan's sister and mother deny voicing such concerns, it is undisputed that the officers reported these concerns to Killgore.

4. It is undisputed that officers attempted for approximately two hours to telephone Sullivan, who was accompanied by his father at the time and could not reach him because the telephone was off the hook or busy.

5. Deputy Mike Parker (a hostage negotiator on the scene) learned that Sullivan had seen a psychiatrist the day before, and he telephoned that physician to determine if Sullivan was taking medication that might be affecting his judgment. The psychiatrist could not talk to Officer Parker when he called but the psychiatrist returned the call a short time later. The physician advised Officer Parker that he had been treating Scott for depression and

4

lack of sleep and expressed concern that Scott Sullivan could be suicidal. Officer Parker reported this information to the command headquarters where Killgore was located.

The above uncontested facts are sufficient to create a reasonable belief that plaintiff was in a precarious emotional condition and was a suicide risk. These facts are therefore sufficient to justify Killgore's action in directing his officers to seize Sullivan and transport him to meet with a counselor and undergo a mental examination and screening. These facts are sufficient to establish probable cause to seize Sullivan under the 4th amendment. Because the undisputed facts demonstrate that Killgore did not violate Sullivan's constitutional rights in taking him into custody, Killgore is entitled to qualified immunity for this conduct. <u>Resendiz v. White</u>, 203 F.3d 902 (5th Cir. 2000); <u>Anthony v. City of New York</u>, 339 F.3d 129, 137 (2d Cir. 2003).

B.

Killgore also complains of the district court's denial of qualified immunity to him on Sullivan's excessive force claim in seizing him. The analysis of this claim is also controlled by Fourth Amendment principles. The Supreme Court stated in <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1985): "Today we make explicit what was implicit in <u>Garner</u>'s analysis and hold that <u>all</u> claims that law enforcement officers have used excessive force-deadly or not- in

5

the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a substantive due process approach."

Sullivan's claim is predicated on his evidence that the handcuffs were too tight and that he experienced pain and had scars and bruising.

The summary judgment evidence is uncontested that Killgore did not handcuff Sullivan or have any role in handcuffing Sullivan. The evidence shows that Deputies Lance Simpson and Tommy Grandfield handcuffed Sullivan in accordance with their usual practice and without any direction from Killgore. Because the uncontested evidence reveals that Killgore did not apply the force used in handcuffing Sullivan, Sullivan did not establish a violation of a constitutional right and the district court erred in denying qualified immunity to Killgore on this claim.

C.

Killgore also complains of the district court's denial of his motion for summary judgment based on qualified immunity as to Sullivan's due process claim arising out of Sullivan's two day detention in Glen Oaks Hospital for mental examination.

It is undisputed that after Sullivan was taken into custody, he was transported to the sheriff's office where he was examined by counselor Cliff Faraby. After his examination, counselor Faraby executed an affidavit stating that in his opinion Sullivan should

6

be committed to a mental health facility for emergency observation and treatment because he posed a substantial risk of serious harm to himself or others. This affidavit supported an application for a warrant of detention which Faraby also completed. Thereafter, this application for warrant of detention was presented to Justice of the Peace Gloria Peters. Magistrate Peters determined that plaintiff should be committed to a mental institution immediately because of the risk of harm Sullivan posed to himself or others and signed an order of detention and commitment. Sullivan was then transported to Glen Oaks Hospital. At Glen Oaks, Sullivan was again examined by a physician who determined that Sullivan should be committed to the hospital because of the risk of harm he posed to himself or others and he was accordingly committed. At the time of his commitment, Sullivan signed a form stating that he had been given an opportunity to obtain the services of counsel. Sullivan was detained at Glen Oaks hospital for two days and was released on June 23, 2000.

In his procedural due process claim, Sullivan complains generally that Killgore did not strictly follow procedures established by the Texas Health and Safety Code, particularly Chapter 573 of that Code. Specifically, Sullivan complains that Killgore took him to the sheriff's office rather than to a hospital after taking him into custody as provided in the Health and Safety Code and also that Killgore did not personally complete the application for detention.

7

We conclude that the district court erred in concluding that these violations of the administrative details of the state health and safety code preclude Killgore's qualified immunity defense. So long as Killgore did not violate rights reserved to Sullivan under the United States Constitution, Killgore is entitled to qualified immunity on his federal claims. The important procedural steps Texas requires for detention were complied with and the procedural steps taken complied with rights guaranteed to Sullivan by the U.S. Constitution. See Matthews v. Eldridge, 424 U.S. 319 (1976). Because Sullivan has failed to demonstrate a denial of a constitutional right, he is entitled to qualified immunity on this claim.

D.

Killgore argues next that the district court erred in denying him qualified immunity on Sullivan's claim that he was denied assistance of counsel. Sullivan's claim is based primarily on Texas Health and Safety Code § 573.025(b)(1). This subsection requires that a detainee be informed of a right to counsel within 24 hours after they are admitted to an inpatient facility. Based on the undisputed evidence, however, plaintiff was advised of his right to counsel within 24 hours after his detention, a fact that the district court also recognized. Even if this obligation to provide counsel under the state statute rises to a U.S. Constitutional requirement, the statutory requirement was satisfied. Because Sullivan was not charged with a criminal

8

offense by the state, no Sixth Amendment right to counsel attached. See McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); U.S. v. Cooper, 949 F.2d 737, 741 n. 1 (5th Cir. 1991). Because neither the district court nor Sullivan point to any clearly established constitutional right to counsel, and we know of no such right, the district court erred in denying Killgore qualified immunity on this claim.

E.

Finally, Killgore argues that the district court erred in denying him qualified immunity on Sullivan's conspiracy claim. Sullivan argued that Killgore conspired with Sullivan's two supervisors, Collins and McRae, to have Sullivan committed so as to discredit him. It is unclear whether this conspiracy claim is asserted under § 1985(3) or under state law. Any claim under § 1985(3) fails as a matter of law because to prevail under that statute, Sullivan must prove a discriminatory animus based on race or some other inherited or immutable class characteristic such as gender, religion or national origin or based upon political association or beliefs. Galloway v. State of Louisiana, 817 F.2d 1154, 1159 (5th Cir. 1987). Sullivan has produced no summary judgment evidence that would serve as a basis for a conspiracy claim.

Sullivan's state law cause of action for conspiracy also fails

because an essential element of a state law conspiracy claim is that one of the co-conspirators commit an unlawful act. Therefore, even if there is evidence of agreement between Killgore and Collins or McRae to have Sullivan committed for a mental examination, accomplishment of this objective was entirely justified, as explained above, so that no proof of a wrongful act was presented. Consequently, Killgore was entitled to official immunity on this claim also.

### III.  Claims Against McRae & Collins

Sullivan's supervisors, McRae and Collins, argue that the district court erred in denying qualified immunity to them from Sullivan's § 1983 and state law claims based on their alleged conspiracy to violate plaintiff's rights.

The district court concluded from a number of unassociated facts that the fact finder could infer that Collins and McRae conspired to have Sullivan committed. These facts include: (1) plaintiff caught Collin's wife rummaging through the desk of a co-employee who was fired for stealing shortly thereafter; (2) prior to seeing Collins's wife, plaintiff had a spotless work record; (3) after seeing Collins's wife, complaints began to be filed about plaintiff; (4) Collins told plaintiff that he could "f@#% him" if he wanted to and that if he liked him plaintiff had nothing to worry about; (5) Collins and McRae were at the scene of the suicide and did not think plaintiff needed help; (6) Collins did not tell Killgore that the day before being committed a psychiatrist told

10

Collins plaintiff was not suicidal; (7) Collins and McRae attempted to force plaintiff to confess to the killing of his fiancé; and (8) Collins and McRae went to plaintiff's family and requested that they sign papers to keep plaintiff at Glen Oaks Hospital, a request that was refused.

Although these facts certainly indicate that the relationship between Sullivan and his superiors was less than friendly, for reasons stated above, we are satisfied that the evidence available at the scene on June 21, 2000, justified the decision to take Sullivan into custody and commit him for a mental screening. It is important to note that Killgore was the decision maker rather than Collins or McRae, and no evidence was presented that either Collins or McRae had any significant input into that decision. The fact that Collins did not tell Killgore that on June 20 a psychiatrist had told Collins that plaintiff was not suicidal, even if true, was not particularly relevant because that same psychiatrist, after being advised of Sullivan's conduct on June 21 reached a contrary conclusion. Consequently the summary judgment evidence does not support an inference that Collins and McRae conspired to violate Sullivan's state or federally protected rights. The district court therefore erred in denying immunity to these two officers.

<u>CONCLUSION</u>

For reasons stated above, we conclude that the district court erred in denying the motions for summary judgment filed by Killgore, McRae and Collins based on qualified immunity for the §

11

1983 claims presented by Sullivan. We also conclude that the district court erred in denying these same defendant's motions for summary judgment on Sullivan's state law claims based on "official immunity".

Consequently, we REVERSE the district court's order denying the defendants' motion for summary judgment and RENDER judgment in favor of the defendants, Kilgore, Collins, and McRae.