*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM E. "BUSTER" FISHER, et al.,
            *Plaintiffs-Appellants,*

            *v.*

No. 02-3996

TOM E. HARDEN, in his official capacity as Sheriff
of Morrow County, Ohio, et al.,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-01377—James L. Graham, District Judge.

Argued: June 11, 2004

Decided and Filed: February 25, 2005

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** James D. McNamara, Columbus, Ohio, for Appellants. Douglas J. Suter, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellees. **ON BRIEF:** James D. McNamara, Columbus, Ohio, for Appellants. Douglas J. Suter, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellees.

        KEITH, J., delivered the opinion of the court, in which CLAY, J., joined. GIBBONS, J. (pp. 12-16), delivered a separate dissenting opinion.

---

## OPINION

---

        DAMON J. KEITH, Circuit Judge. The Plaintiff-Appellant, William E. "Buster" Fisher, filed a complaint on December 4, 2000, in which, pursuant to 42 U.S.C. § 1983, he charged the Defendants-Appellees, Sheriff Tom E. Harden, Deputy Stephen Alexander, Deputy Molly Alexander, and Deputy Mark Leary (collectively "the Defendants"), with having violated his right against an unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. On May 9, 2002, the Defendants filed a joint motion for summary judgment. The district court subsequently issued an opinion and order on August 6, 2002, in which it granted the Defendants' request for a summary judgment on the grounds that (1) they had a reasonable suspicion that Fisher was suicidal, and, as a consequence, their actions in affecting a seizure of Fisher were protected by the doctrine of qualified immunity, and (2) there was no genuine

1

issue of material fact on Fisher's claim that the County failed to adequately train and supervise the deputies. In this appeal, Fisher asserts that the officers who seized him did not have probable cause to justify a mental health seizure, and that Harden failed to adequately train and supervise his deputies.[1] For the reasons set forth below, we REVERSE, in part, and AFFIRM, in part, the judgment of the district court.

## *FACTUAL BACKGROUND*

The facts relevant to this cause occurred on the afternoon of July 10, 2000, in a rural farming area of Morrow County, Ohio. The area consists of wide open farming land, with heightened visibility in all directions. On that day, Fisher, a seventy-seven-year-old retired farmer, had gone out to shoot groundhogs, an activity in which he routinely engaged in an effort to help protect his neighbors' crops. Dressed in bib overalls, Fisher had taken with him a folding chair, his rifle, and a tripod that he used to help him aim his rifle and hold it steady. He positioned himself, sitting in the folding chair, upon an elevated railroad grade on one of his neighbor's property.

Fisher sat at a distance of approximately 250 yards from County Road 59, a rural road that runs through this area of Morrow County. A passerby noticed Fisher off in the distance sitting on railroad tracks and found his presence there quite unusual. Upon gathering that this was possibly a suicidal person, the passerby telephoned the Morrow County Sheriff's Department and reported, incorrectly, that a man had his feet tied to the railroad tracks. The Sheriff's Department subsequently dispatched a "Code 58," which indicates a possible suicide.

Two of the Defendants, deputies Stephen Alexander and Molly Alexander, who are husband and wife, responded to the dispatch. Upon their arrival on the scene, the officers located Fisher, who was still seated in his folding chair approximately 250 yards away. Mr. Alexander used the cruiser's microphone and speaker system to arouse Fisher's attention and instruct him to come toward the officers. Fisher stood up, gathered his belongings, and began walking along the railroad tracks toward the officers. As Fisher proceeded toward them, the officers noticed he was carrying a rifle slung over his shoulder. They drew their firearms, crouched behind their open cruiser doors, and ordered Fisher to lay down the rifle before coming any closer. The officers acknowledged that initially Fisher appeared unable to hear their first command, and they responded with additional instructions for him to lay down his rifle. Upon hearing their command at a distance of nearly 200 yards away, Fisher readily complied with their request. The officers instructed Fisher further to lay down his folding chair and tripod. Again, once Fisher could hear their request, he readily complied.[2]

_____

[1] Although Fisher's spouse, Doris Fisher, is also a named Plaintiff-Appellant in this cause of action, her state law claim for infliction of emotional distress was dismissed by the district court, which declined to exercise supplemental jurisdiction over all of the state law claims after it concluded that the Defendants were entitled to summary judgment. Inasmuch as the district court did not rule upon the state law claims as a matter of law, those claims are not the subject of this appeal.

[2] Although the dissent complains that it is "unclear whether . . . Fisher 'readily' complied with the requests once he heard them," dissent at 12, the record of this case fully supports this fact. The record indicates that Fisher did not take *any* action other than to lay down his rifle after he heard the deputy's command. During the following exchanges in his deposition, Mr. Alexander responded to questions concerning Fisher's compliance:

Q.    What was the first conversation that occurred after you got out of your cruiser?
A.    I grabbed the mike to the PA and advised the subject to put down his gun. He did not seem as though you [sic] heard me the first time, so I told him the second time. Still no reply as though he heard me. So again I told him. And it was probably the third or fourth time that I told the subject to put down the gun that he did so.
. . .
Q.    Okay. As he got closer to you, and you continued to give this command through the speaker, at some point it appeared that he did hear you; correct?

For the next couple of minutes, the officers observed Fisher walk toward the road, with nothing in his hands. As he walked deliberately toward them, it became apparent to Mr. Alexander that Fisher was an older gentlemen. The officers conceded that he approached them in a normal fashion, and did not act out or say or do anything out of the ordinary. Nonetheless, they kept their weapons drawn and trained upon him. As Fisher arrived at the road, Mr. Alexander directed him to walk backwards toward Mrs. Alexander. After he finally reached them, the officers commanded Fisher, still at gunpoint, to lay face down on the roadway, and handcuffed him behind his back.

Fisher immediately went into cardiac arrest. After unsuccessfully attempting to stand Fisher on his feet, the officers left him handcuffed and lying on the ground. Presumably unaware of the seriousness of Fisher's condition, Mr. Alexander immediately went to retrieve the objects that Fisher had placed on the ground. Shortly thereafter, a woman who lived nearby and another Defendant, Deputy Mark Leary, separately arrived at the scene. The woman, who had been unable to attain sufficient attention from the Alexanders, informed Leary that Fisher suffered from a heart condition. Leary, observing Fisher's distressed state, uncuffed him, turned him on his back and called for medical assistance. Fisher was life-flighted to Riverside Hospital in Columbus, Ohio, for emergency care. Although Fisher survived, he is permanently disabled as a result of the incident.

Approximately five months later, to wit, December 4, 2000, Fisher filed a complaint against the Defendants in the United States District Court for the Southern District of Ohio. In the complaint, Fisher charges, among other things, that the officers violated his right, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, to be free from unreasonable seizure without probable cause, and that Sheriff Tom Harden failed to adequately train and supervise his deputies. On August 6, 2002, the district court granted the Defendants' motion for a summary judgment. In doing so, the district court determined that the officers were entitled to qualified immunity because Fisher had failed to establish a constitutional violation, and that there was no genuine issue of a material fact to support his claim against Harden for a failure to train and supervise his deputies. This appeal followed.

## *DISCUSSION*

This court conducts a de novo review of a district court's grant of summary judgment. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To defeat a properly supported motion for summary judgment, an adverse party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Fisher raises two issues on appeal. First, he claims that because he pleaded facts sufficient to establish a constitutional violation, the district court erred in granting qualified immunity to the Defendants. Second, Fisher asserts that a genuine issue of material fact exists on his claim that Harden failed to properly train and supervise his deputies. We address each of these issues in turn.

---

A.    Correct. He laid the gun down. And then I advised him to put the chair and whatever else he had down. It took him two or three times to put the chair down. And then I continued to ask him to step to the road, turn around and walk backwards to us.
. . .
Q.    He did obey you when it appeared that he finally heard what you were trying to tell him?
A.    Correct.

Joint Appendix ("J.A.") at 272-75. On the basis of this evidence, we conclude that Mr. Alexander's testimony clearly evinces Fisher's ready and willing compliance with the deputy's commands, once he heard those commands.

I.

In his first point of error, Fisher contends that he has established a constitutional violation because the facts, as asserted by him, establish that the officers arrested him without the probable cause that is required to support a mental health seizure. The district court concluded that the officers did not need probable cause to justify their seizure of Fisher, but only needed reasonable suspicion that he was suicidal. Since the officers could point to articulable facts to support a reasonable suspicion that Fisher was suicidal, the district court determined that Fisher had failed to establish a constitutional violation, and as a result the officers were entitled to qualified immunity.

Whether qualified immunity applies to an official's actions is a question of law that this court reviews de novo. *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001). Qualified immunity "is conceptually distinct from the merits of the plaintiff's claim." *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). It is "an entitlement not to be forced to litigate the consequences of official conduct." *Id*. "The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id*. at 526.

In defining this entitlement, the Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In 2001, the Court established a two-part test for determining whether qualified immunity applies. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the initial inquiry, we must consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id*. If the facts, as alleged by the claimant, fail to establish a violation, then immunity applies. On the other hand, if the alleged facts sufficiently demonstrate a constitutional violation, we must determine "whether the right was clearly established." *Id*.

A.

We address the threshold question of whether the facts alleged show the officers' conduct violated a constitutional right. Fisher argues that the officers violated his Fourth Amendment rights when they arrested him without the probable cause that is required to justify a mental health seizure. The district court, however, determined that the officers did not arrest Fisher but rather restrained him as a part of a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). In awarding qualified immunity to the officers, the district court analogized a mental health seizure to a criminal seizure, determining that "the same Fourth Amendment standards applicable to investigative stops and arrests for criminal activity apply as well to police investigations of persons who are reportedly mentally ill." J.A. at 28. As such, the district court determined that "even where probable cause is lacking, a police officer, pursuant to the guidelines applicable to a *Terry* stop, may investigate a report of a possibly suicidal individual where articulable facts indicate that the individual may present a danger to himself or to others." J.A. at 29. Inasmuch as the district court also believed that the officers had an articulable and reasonable suspicion that Fisher might harm himself or others, it held that the investigative stop did not violate the constitution. We disagree.

This case involves a seizure on the basis of an attempted suicide report. The Defendants do not contest that Fisher was seized, but rather advocate that his seizure was valid as part of an investigative *Terry* stop. The Defendants, however, concede that they were not responding to a report of criminal conduct and that they never suspected that Fisher was engaged in or about to be engaged in a crime. Absent suspected criminal activity, in this circuit a law enforcement official may not physically restrain an individual merely to assess his mental health. Rather, we have established that in the context of a mental health seizure an officer must have probable cause to

believe that the person seized poses a danger to himself or others.  We analyze cases such as this under the probable cause standard announced by this court in *Monday v. Oulette*, 118 F.3d 1099, 1102 (6th Cir. 1997).  Under that standard, officers detaining an individual believed to be suicidal must have "probable cause to believe that the person is dangerous to himself or others." *Id*.

In *Monday*, an officer responded to a radio dispatch that the plaintiff had telephoned a mental health worker and stated that he was upset over a divorce, had ingested some pills, and was drinking alcohol in an effort to commit suicide.  When the officer entered the home, the plaintiff in fact was drinking alcohol and appeared intoxicated and depressed.  The officer's count of the plaintiff's Xanax pills revealed that at least twenty were missing.  Under those circumstances, we held that the officer "had probable cause to believe that [the] plaintiff was attempting to commit suicide, or at least might injure himself." *Id*.

A showing of probable cause in the mental health seizure context requires only a "probability or substantial chance" of dangerous behavior, not an actual showing of such behavior. *Id*. (citing *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)).  Just as actual innocence will not render invalid an arrest that is properly based upon probable cause that criminal activity was occurring, a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition. *Id*.  Courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official. *Id*.  "If the circumstances, viewed objectively, support a finding of probable cause, [then] the arresting officer's actual motives are irrelevant." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

In this case, unlike in *Monday*, the Defendants are unable to demonstrate that they had probable cause to believe that Fisher was a danger to himself or others.  The officers were responding to a dispatch that a man, who had tied himself to railroad tracks, might be attempting to commit suicide.  When they arrived, they ordered Fisher to come to the road.  His doing so immediately revealed that he was not tied to the railroad tracks as had been reported.  This alone would have caused a reasonable officer to question the veracity of the attempted suicide report.  When the officers noticed that Fisher had a rifle slung over his shoulder, they ordered him to put it down, and he complied.  He proceeded towards them in a normal manner for an individual of his age.  Unlike the officers in *Monday*, the Alexanders never questioned Fisher to determine if he might be depressed and attempting to commit suicide.  Even after Fisher arrived at the road and it became apparent that he was a man of his later years and dressed in hunting attire, the officers still did not make any inquiry of him, his purpose for being there, or the activity in which he was seemingly engaged at the time of their arrival.  Instead, with their firearms continually trained upon him, they ordered Fisher to get face-down on the roadway and handcuffed him behind his back.

In addition, Fisher did not do anything that the officers considered to be suspicious or threatening.  He did not carry his rifle in a ready position in his hands.  He did not point it at the officers, himself, or anyone else.  He put the rifle down when asked to do so and walked away from it, never turning back toward the gun.  At the time he was handcuffed, the rifle lay on the ground roughly 200 yards away.  The officers never saw Fisher in possession of any other weapon.  Fisher was never verbally threatening, abusive, or irrational; he did not make any statements about hurting himself or anyone else; and he never attempted to avoid the officers or flee the area.  Both officers admitted that Fisher did not do anything that made them afraid.  In light of these circumstances, there are simply no facts from which a reasonable officer could have found a probability or substantial chance that Fisher posed a danger to himself or others at the time he was seized.  Viewing the facts in the light most favorable to him, we find that Fisher has established a violation of his Fourth Amendment rights.

The Defendants urge us to adopt a rule that would apply the law of *Terry v. Ohio* to mental health seizures.  Based on our precedent, we decline to do so, but such a rule would not apply to this

case in any event. Even assuming, *arguendo*, that as part of an investigatory detention officers were permitted to physically restrain a detainee in order to assess his mental state (and all in the absence of a reasonable suspicion of criminal conduct), this rule would not apply in the instant case because the force used by the Alexanders elevated their seizure of Fisher from a mere investigatory stop to an arrest. "Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Heath*, 259 F.3d 522, 529-30 (6th Cir 2001) (quoting *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997)). *See also Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003) ("An investigative *Terry* stop may ripen into a *de facto* arrest through the passage of time or the use of force."); *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003) (determining whether an investigatory stop "escalated" into an arrest). If, through the passage of time or use of force, an investigative detention ripens into an arrest, "a suspect's continued detention *must* be based upon probable cause." *Weaver*, 340 F.3d at 408 (emphasis added). In determining whether a confrontation that began as a *Terry* stop has matured into an arrest, we assess "whether the use of force was reasonably related in scope to the situation at hand," *Feathers*, 319 F.3d at 851, or, likewise, whether "the length and manner of [the] investigative stop [was] reasonably related to the basis for the initial intrusion," *Weaver*, 340 F.3d at 408. "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

Assuming that these principles are applicable to the present case, we would agree that the encounter here began as an investigatory stop incident to a suicide report. Nevertheless, in light of Fisher's compliance and because he did not take any sudden, unpredictable, or threatening action toward the officers, it is abundantly apparent that the seizure of Fisher quickly elevated into a full arrest. In assessing the use of force in this case, we conclude that the manner in which the deputies seized Fisher was not reasonably related to the basis of their initial intrusion. The Alexanders confronted Fisher on the basis of a report that he was suicidal. Mr. Alexander testified that his purpose in seizing Fisher was to determine whether he was suicidal – "to find out why he would have been depressed or what have you," J.A. at 298, and "[t]o see if he was suicidal or see if he needed medical attention," *id*. at 301. Indeed, the district court similarly found that "it is true that when the deputies made contact with Mr. Fisher, they did so *solely* to investigate a possible suicide." *Id*. at 26 (emphasis added).

In his deposition, Mr. Alexander testified that he was familiar with the area and knew it to be an unincorporated rural area, where hunting routinely occurred and it is lawful for a citizen to be in public with a rifle. Fisher was wearing bib overalls with a small, homemade pouch for ammunition on the front. He had been holding a hunting rifle, seated in a folding chair, with a tripod to help steady and aim the rifle. He presented the appearance of an elderly man hunting in a location where hunters are commonly found. Everything about Fisher's appearance, in that setting, suggested a benign encounter rather than a dangerous one.

Moreover, Mr. Alexander admitted that Fisher did not do anything that caused the officers concern subsequent to laying down his rifle. When asked, "Other than the normal caution that all police officers should exercise, you didn't see Mr. Fisher do anything that caused you to be fearful of him once he laid the gun down, did you?" *id*. at 299-300, Mr. Alexander responded, "I don't recall him doing anything, no," *id*. at 300.

Despite this acknowledgment that Fisher took no action that caused them to fear for their safety, the Alexanders forced Fisher face-down on the ground, at gun point, and handcuffed him. The deputies employed this force without any suspicion that Fisher was involved in criminal activity, without frisking him for other weaponry, and without asking him a single question. Based on our review of the record, we do not find that this use of force represented "the least intrusive

means reasonably available to verify or dispel" the Alexanders' suspicion that Fisher was suicidal. We conclude that the use of force exceeded what was required for an investigative stop and that the manner in which the deputies seized Fisher constituted an arrest. In the absence of probable cause, such action violates the constitution.

In holding that Fisher has set forth a constitutional violation, we also conclude that the facts only support a violation by the Alexanders. We do not find that Leary committed any such violation. Indeed, all of the evidence indicates that Leary essentially came to Fisher's rescue by removing his handcuffs and calling for emergency medical assistance. Hence, as to Leary, we agree with the district court that Fisher has not shown a constitutional violation.

B.

Next, we must determine "whether the right was clearly established." *Saucier*, 533 U.S. at 201. This second inquiry, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202 (citation omitted). The relevant, dispositive inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.

"This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citation omitted). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). In determining whether a right is clearly established, we have concluded that "in the ordinary instance, . . . a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Ohio Civil Serv. Employees Assoc. v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988). "A mere handful of decisions of other circuit and district courts, which are admittedly novel, cannot form the basis for a clearly established constitutional right in this circuit." *Id*. at 1177-78. We, however, also noted that in certain cases "it may be possible for the decisions of other courts to clearly establish a principle of law." *Id*. at 1177. In these exceptional cases, the decisions of other courts may provide clearly established law if the decisions "both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Id*.

Applying these principles to the present case, we conclude that the right was clearly established. The specific question at issue is whether it was clearly established at the time of Fisher's arrest that a law enforcement officer may not affect a mental health seizure without probable cause. As we have already noted, in 1997 this court specifically held that "[t]he Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday*, 118 F.3d at 1102. The seizure in this case was not specifically for purposes of a professional psychiatric evaluation. This difference, however, is of no effect.[3] Viewing the evidence in the light most

---

[3]The dissent attempts to distinguish *Monday* by arguing that "there is no indication that the deputies seized Fisher to detain him until he received a psychiatric evaluation," but rather that they "detained Fisher temporarily in order to determine whether probable cause existed to detain him further." Dissent at 13-14. This theory, however, assumes that the law governing investigative *Terry* stops in the criminal context applies equally to cases involving only a mental health seizure. That is not the law of this circuit.

In search of some support for its theory, the dissent attempts to expand this court's holding in *Monday*, and

favorable to Fisher, we must reject the sentiments of the dissent that the deputies were "merely securing the scene." Dissent at 14. First, we reiterate that the district court found that "it is true that when the deputies made contact with Mr. Fisher, they did so solely to investigate a possible suicide." J.A. at 26. In addition, Mr. Alexander claimed that "[i]f Mr. Fisher was a suicide risk and if [he] felt [Fisher] was in a mind set where he could be of risk to himself or others, [he] had the right under Ohio statute to take Mr. Fisher into protective custody."[4] Moreover, Fisher did not do anything that caused the officers to fear for their safety. *See id.* at 299-300. This record evidence reveals that the officers seized and detained Fisher, not merely to secure the scene, but for purposes of a mental health evaluation. Under our Fourth Amendment jurisprudence, that action requires probable cause.[5]

We have not found any case in which this court has stated that officers may restrain an individual's liberty on the sole basis that they have a reasonable suspicion that the individual suffers from a mental illness. In addition, the other circuits that have examined this issue have similarly held that probable cause is the correct standard. *See, e.g., Sullivan v. County of Hunt, Tex.*, No. 03-41165, 2004 WL 1636919 (5th Cir. July 21, 2004) (citing *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003), a mental health seizure case in which the Second Circuit granted qualified immunity under the probable cause standard); *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003) (officers must have probable cause to seize for emergency mental evaluation); *Glass v. Mayas*, 984 F.2d 55 (2d Cir. 1993) (requiring probable cause for involuntary hospitalization); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397 (7th Cir. 1993) (requiring probable cause to detain for psychiatric evaluation); *Gooden v. Howard County, Md.*, 954 F.2d 960 (4th Cir. 1992) (finding that it is clearly established that officers need probable cause for mental health seizure); *Harris v. Pirch*, 677 F.2d 681 (8th Cir. 1982) (requiring good faith and probable cause for emergency commitment); *In re Barnard*, 455 F.2d 1370 (D.C. Cir. 1971) (requiring probable cause to detain person believed to be mentally ill and dangerous).

---

claims that in that case "this court analogized a dangerous mental condition 'to the role of criminal activity in traditional Fourth Amendment analysis.'" Dissent at 14. A full reading of the applicable passage in *Monday*, however, reveals that the analogy to criminal activity was used solely for the specific purpose of defining *what* constitutes probable cause:

> The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others. If a dangerous mental condition is analogized to the role of criminal activity in traditional Fourth Amendment analysis, a showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior.

118 F.3d at 1102 (citations omitted). Thus, *Monday* never indicated that in the absence of criminal activity some lesser standard (i.e., reasonable suspicion) would apply to a less intrusive seizure.

[4] In this regard, we also note that the district court found the following:

> Suicide is not a crime in Ohio. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). However, the deputies were aware that under Ohio law, they had the authority to take a person into custody and transport the person to a hospital for a mental evaluation where they had "reason to believe that the person is a mentally ill person subject to hospitalization by court order . . . and represents a substantial risk of physical harm to self or others if allowed to remain at liberty pending examination."

J.A. at 26 (quoting Ohio Revised Code § 5122.10).

[5] We note the possibility that under certain emergency or exigent circumstances, where officers have reasonable suspicion (but not probable cause) to believe that it is imminent that an individual may commit suicide unless the officers intervene, a seizure may be constitutionally permissible. Those circumstances could present an exception to the general rule requiring probable cause to effect a mental health seizure. We do not believe that this case presents circumstances justifying the application of such an exception.

To support its position that the mere possession of a firearm by Fisher distinguishes the present case, the dissent cites *Bell v. Irwin*, 321 F.3d 637 (7th Cir. 2003), and *United States v. Wallace*, 889 F.2d 580 (5th Cir. 1989). Both of these cases are inapposite. In *Bell*, Douglas Bell's wife telephoned the police seeking protection after he threatened her. Although the couple quickly reconciled and asked the responding police officer to leave them alone, forty minutes later one of their neighbors called the police and reported that the wife was knocking on doors in search of safety. Returning to the scene, the same officer located Bell's wife down the street. Bell refused to allow the officer into his home, who initiated a background check,[6] and Bell's wife informed the police that her husband had attempted suicide.

Through a window, the police observed Bell holding several knives, one of which he drove into a wall near the front door and several of which he threw into the yard in the direction of the police. Bell specifically "told the [police] chief that he would kill any officer who entered and then kill himself," *id*. at 638, and "threatened to blow up his home using propane and kerosene in tanks immediately outside," *id*. at 639. The local police then sought assistance from the state police and even from Bell's father. None of these negotiations were prevailing. Following all of these activities, an officer fired bean-bag rounds at Bell because he observed Bell lean toward one of the tanks with what appeared to be a cigarette lighter. As a result, Bell was injured and filed suit against certain individual officers asserting that they used excessive force.

*Bell* was not a case about unreasonable seizure; instead it was a case about the use of excessive force, where the plaintiff threatened that "he would kill any officer who entered and then kill himself." 321 F.3d at 638. Every alleged case of attempted suicide does not include threats to others. Indeed, there were no threats in the present case. The facts in *Bell* are completely at odds with the facts presently before this court. Certainly *Bell* does not support the proposition that Fisher's lawful possession of a firearm, standing alone, constitutes a sufficient basis upon which to justify the seizure in this case.

The other case upon which the dissent relies, *Wallace*, involved circumstances in which the police responded to a "disturbance." 889 F.2d at 582. Upon arriving at an apartment complex where the "disturbance" was reported, the officers heard loud voices emanating from the apartment. The officers knocked on the apartment door and "the door was opened by a woman who was red-faced and crying." *Id.* Wallace also came to the door. When the police asked whether "everything was okay," *id*., Wallace "responded affirmatively," *id*., but the woman "quickly said 'no' and informed the officers that Wallace had a gun and was threatening to kill himself," *id*. The officers then restrained Wallace's hands and removed his gun.[7] In upholding the district court's denial of Wallace's motion to suppress the gun, the Fifth Circuit determined that the removal of Wallace's gun was "nothing more than a 'stop and frisk,'" *id*., pursuant to *Terry v. Ohio* because "[a]fter learning from the *obviously distressed companion* that Wallace had a gun and was threatening suicide, '[i]t would have been poor police work indeed' for the police to have left the scene," *Wallace*, 889 F.2d at 582 (emphasis added) (citation omitted) (second bracket in original).

*Wallace* is also readily distinguishable from the present case. In *Wallace*, the officers were responding to a report of a disturbance, not a suicide report, and received confirmation through verbal and visual signs that Wallace could be a danger to himself and others. They acted only after Wallace and his wife could not agree on whether "everything was okay," and after she told them that Wallace had a gun and was threatening suicide. In the present case, the information presented to

---

[6] Bell had a history of arrests for domestic violence, unlawful use of weapons, obstruction of justice, and drunk driving.

[7] The officers arrested Wallace for disorderly conduct, and Wallace was subsequently indicted for being a felon in possession of a firearm.

the officers was much more vague.  The Alexanders were investigating an unconfirmed report that an individual was suicidal.  Fisher was not in the company of an obviously distressed companion.  And, the deputies failed to question him.  Rather, they drew their guns, ordered Fisher to the ground, and handcuffed him.[8]

Fisher has alleged facts sufficient to establish a violation of his constitutional rights.  It is clearly established that an officer may not affect a mental health seizure without probable cause.  Viewing the facts in the light most favorable to Fisher, we conclude that the Alexanders engaged in conduct that violated a clearly established constitutional right.  Accordingly, we find that qualified immunity does not shield them from civil liability.

## II.

Fisher also charges Tom Harden, in his official capacity as Sheriff of Morrow County, Ohio, with a failure to train and supervise his deputies.  "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978).  To succeed on his *Monell* claim, Fisher must prove that the Morrow County Sheriff's Department was deliberately indifferent to the rights of citizens who came into contact with deputies.  *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).  Fisher must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.  *See id.*; *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Stemler*, 126 F.3d at 865 (citation omitted).

In this case, the evidence indicates that the officers received police training from the Ohio Peace Officers Training Academy.  Mr. Alexander also trained for two months under the supervision of two sergeants.  Despite his arguments to the contrary, Fisher has failed to produce sufficient evidence that the officers' training programs were inadequate.  In addition, Fisher has not shown that the County knew of prior unconstitutional actions by its employees and failed to respond.  Accordingly, the district court did not err in granting summary judgment for Harden on the failure to train and supervise claim.

## III

For the foregoing reasons, we find that the district court erred in granting summary judgment for the Alexanders on Fisher's constitutional claim, but not with respect to its summary judgments for Leary or Harden.  The district court's order of summary judgment is **REVERSED**, in part, **AFFIRMED**, in part, and the case is **REMANDED** for proceedings consistent with this opinion.

---

[8]The dissent also relies upon *United States v. Butcher*, Nos. 92-3987/4011, 1993 WL 272450, at *7 (6th Cir. July 19, 1993), for the proposition that the "fact that Fisher possessed one firearm gave the deputies reason to believe that he possessed another."  Dissent at 16.  *Butcher*, however, is also inapposite.  That unpublished criminal case involved an appeal of a district court's order denying the defendants' motion to suppress evidence.  The facts underlying the conviction involved a traffic stop, where the officers suspected the defendants of involvement in criminal activity, and in which a background check confirmed these suspicions, all prior to the contested seizures.  One of the officers conducted a visual sweep of the front passenger compartment, during which he noticed the tip of a weapon under the seat.

When the *Butcher* court stated that the presence of a shotgun gave the officers a reasonable suspicion to believe that the defendants may possess other weapons on their persons, the issue before the court was whether a pat down or frisk of the defendants was justified.  The officers, however, were presented with numerous indicia of criminal activity prior to the pat down.  In the present case, the Alexanders never suspected Fisher of criminal activity.  Even more, Fisher was not subjected to a pat and frisk prior to being forced to the pavement and handcuffed.

---

**DISSENT**

---

JULIA SMITH GIBBONS, Circuit Judge, dissenting. In my view, deputies Stephen and Molly Alexander did not violate Fisher's constitutional rights, and they were thus entitled to qualified immunity. I therefore dissent.

Initially, I note significant facts in the record that are not emphasized in the majority's opinion. First, while it eventually came to light that Fisher was perched on the railroad tracks in order to shoot groundhogs, the defendants testified that they were not familiar with Fisher prior to the incident and were not aware of his penchant for hunting groundhogs. Stephen Alexander was, however, aware that individuals sometimes committed suicide by sitting on the railroad tracks. This fact was known to Stephen both because his father had been a long-time railroad employee who told Stephen of people that had committed suicide by sitting on the tracks and because he was aware that, approximately one year prior, another individual committed suicide in Morrow County in such a manner. While the area in which Fisher was located was a rural area that hunters sometimes used, it is at a minimum questionable whether, as the majority asserts, Fisher "presented the appearance of an elderly man hunting." *See* slip op. at 6. At the time of the incident, the deputies thought Fisher was a suicidal threat to himself and others, not a hunter.[1]

Second, Fisher did not comply with the deputies' initial requests that he place the firearm and other items he was carrying on the ground. Although it is unclear at what point Fisher was able to hear the deputies' requests, it is also unclear whether, as the majority asserts, Fisher "readily" complied with the requests once he heard them. *See id.* at 2. Stephen Alexander stated in his deposition that Fisher eventually obeyed the officers' requests, but he certainly did not portray Fisher's compliance as "ready and willing." For example, after it appeared that Fisher heard the officers, it still took two or three more requests for Fisher to comply with the request to put his chair down on the ground, according to both the incident report and Alexander's deposition testimony.

Third, as Fisher reached the road, at the point when Stephen told Fisher to walk backwards toward him and Molly, Stephen noticed several firearm ammunition shells in Fisher's overalls. Stephen could not tell at that time for what type of gun the shells were intended. Because he believed that the firearm Fisher placed on the ground was a shotgun and was unsure what type of shells Fisher had on his person, he feared that Fisher possessed another firearm. While it may not have been "out of the ordinary" for Fisher to have numerous ammunition shells on his person, it is certainly an important fact to note in assessing whether his constitutional rights were violated. *See id.* at 3. Also, in her supplemental statement in the police record and in her deposition, Molly Alexander noted that it appeared to her that Fisher had knelt down and picked something up after dropping his firearm, chair, and tripod.

The majority accurately lays out the test for whether qualified immunity applies to an official's actions. The first step in any qualified immunity inquiry is to determine whether the conduct of the officer in question violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If no constitutional violation occurred, then the officer is entitled to qualified immunity. *See Vakilian v. Shaw*, 335 F.3d 509, 516-18 (6th Cir. 2003); *Mattox v. City of Forest*

---

[1] The majority states that the defendants conceded that "they were not responding to a report of criminal conduct and that they never suspected that Fisher was engaged in or about to be engaged in a crime." Slip op. at 5. While it is true that the deputies were not responding to a report of criminal conduct, and there is no indication that the deputies thought Fisher was about to engage in some *specific* or premeditated criminal activity, the record makes clear that the deputies *did* in fact suspect (reasonably) that Fisher might pose a general threat to himself and other people.

*Park*, 183 F.3d 515, 520-24 (6th Cir. 1999). An examination of the facts of this case reveals that no constitutional violation occurred and that the majority thus errs in reaching the second step of the analysis - whether the right was clearly established. *See Saucier*, 533 U.S. at 201.

The Fourth Amendment grants citizens the right to be free from unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Gardenhire v. Schubert*, 205 F.3d 303, 312-13 (6th Cir. 2000). Fisher claims that the deputies violated this right when they detained him. The first issue to resolve is the precise point at which the deputies seized Fisher for Fourth Amendment purposes.

Not every encounter between a law enforcement officer and a citizen constitutes a seizure under the Fourth Amendment. For instance, a consensual encounter between an officer and a citizen during which the officer seeks voluntary cooperation from the citizen is not a seizure, and the officer need not possess any suspicion that the citizen is engaging in criminal activity to initiate such an encounter. *United States v. Chapman*, 305 F.3d 530, 533 (6th Cir. 2002). A seizure occurs for the purpose of the Fourth Amendment only when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostik*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). An example of a seizure is when an officer draws his weapon on a citizen. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In this case, no seizure of Fisher occurred until the Alexanders drew their guns on him, which occurred when the deputies noticed he was carrying a gun across his shoulder. Until that point, the deputies did not signal to Fisher that his liberty was limited in any way. Fisher began approaching the deputies without being asked to do so and of his own accord. Only when the deputies drew their firearms did the encounter transform from a purely consensual one into a seizure for the purposes of the Fourth Amendment.

Of course, considering that a seizure did occur when the deputies displayed their weapons, the next question is whether the seizure and the deputies' related actions were appropriate. Under traditional Fourth Amendment jurisprudence, a police officer may temporarily detain an individual for investigation when he has a reasonable suspicion that the individual is or is about to be engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *United States v. Patterson*, 340 F.3d 368, 370 (6th Cir. 2003). The majority interprets this test to mean that a police officer – in jurisdictions in which suicide is not a crime, as is the case here, *State v. Sage*, 510 N.E.2d 343, 346 (Ohio 1987) – may not conduct an investigatory stop of an individual when he has a reasonable suspicion only that the individual is about to commit suicide (but not engage in an actual criminal activity). Applying this interpretation of *Terry* to the present case, the majority holds that the deputies needed probable cause to detain Fisher. I disagree.

The majority relies on cases from this and other circuits indicating that, before detaining an individual suspected of having mental illness for an emergency medical evaluation or for involuntarily hospitalization, a police officer must have probable cause to believe that the individual is a threat to himself or others. *See, e.g.*, *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir. 1997) ("The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others."). These cases are inapposite here. First, there is no indication that the deputies seized Fisher to detain him until he received a psychiatric evaluation. Rather, the record shows that the deputies momentarily detained Fisher to ensure that he was not a threat to them and then to question him. As Stephen Alexander explained, he was trying

to lie the suspect down, handcuff the suspect *for officer safety*, stand Mr. Fisher up, get him off the railroad track and over to the cruiser *where I could pat Mr. Fisher down for weapons and ascertain what was going on. If* Mr. Fisher was a suicide risk *and if* I felt he was in a mind set where he could be of risk to himself or others, I had the right under Ohio statute[2] to take Mr. Fisher into protective custody.

(Emphasis added.)  In other words, the deputies detained Fisher temporarily in order to determine whether probable cause existed to detain him further or hospitalize him pending a psychiatric evaluation.  The majority concedes that "[t]he seizure in this case was not specifically for purposes of a professional psychiatric evaluation," but states that this difference from *Monday* is of no effect. *See* slip op. at 7.  I disagree.  As Stephen Alexander explained, only *if* Mr. Fisher was a suicide risk, *and if* he could be a risk to himself or others, would the Ohio statute giving Alexander the right to hospitalize Fisher involuntarily apply such that probable cause would be necessary.  As it happened, the whole episode lasted only five minutes, and by the time of Fisher's medical emergency, the deputies had not yet decided to detain him for a psychiatric evaluation.  They were merely securing the scene and beginning to investigate whether such a detention would have been warranted, but the investigation was never completed because of Fisher's unfortunate medical incident.  Probable cause was not required to conduct this temporary investigation and detention.

In *Monday*, this court analogized a dangerous mental condition "to the role of criminal activity in traditional Fourth Amendment analysis."  118 F.3d at 1102.  The majority reads *Monday* as requiring that "officers detaining an individual believed to be suicidal must have 'probable cause to believe that the person is dangerous to himself or others.'" *See* slip op. at 5 (quoting *Monday*, 118 F.3d at 1102).  This is not a precise reading of *Monday*, where the court set out probable cause as the standard for officials seizing and detaining a person for a psychiatric evaluation, but, contrary to the majority's intimations, did not hold that officers must have probable cause to detain *every* individual believed to be suicidal.  118 F.3d at 1102.  Crucially, the allegedly suicidal plaintiff in *Monday* did not have a weapon and posed a threat only to himself, not to others. *Id.* at 1101.  In contrast, many of those individuals who are about to commit suicide certainly have a dangerous mental condition, one that poses a threat to both themselves *and* anyone else in their vicinity. *See, e.g., Bell v. Irwin*, 321 F.3d 637, 639-40 (7th Cir. 2003) (noting that a person who had made suicidal threats while wielding knives was a danger to both himself and others present).  The same logic that forms the basis for the *Monday* court's analogy of "dangerous mental condition[s]" to criminal activity also suggests that if a police officer has a reasonable suspicion that an individual is suicidal in a way that poses a risk to others, he may conduct a *Terry* stop of that individual even if suicide is not a crime in that jurisdiction. *See Monday*, 118 F.3d at 1102; *United States v. Wallace*, 889 F.2d 580, 582 (5th Cir. 1989) (holding that, in order to secure the safety of the individual and all others present, a police officer may conduct a stop and frisk of an individual when he has a reasonable suspicion that the individual is about to commit suicide and that the individual possesses a firearm).  In fact, failing to ascertain whether an individual is suicidal would be "poor police work indeed," since an armed individual is potentially dangerous not only to himself but to others present. *Id.* (quoting *Terry*, 392 U.S. at 23).  Therefore, the deputies in this case needed only a reasonable suspicion that Fisher was potentially about to engage in criminal activity.

Application of the correct standard of reasonable suspicion (not probable cause) to the present case yields the conclusion that the Alexanders did not violate Fisher's constitutional rights.  Whether reasonable suspicion to support a stop and frisk exists in any given case depends upon the totality of the circumstances known to the officers at the time of the seizure. *See United States v. Ridge*, 329 F.3d 535, 540 (6th Cir. 2003).  Reasonable suspicion must be based on particularized and

---

[2]Ohio Rev. Code § 5122.10 grants police officers the right to hospitalize involuntarily individuals they have reason to believe are mentally ill.

objective evidence, but the evidence need not be as reliable or extensive as that required to support probable cause. *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (noting that reasonable suspicion "is obviously less demanding than . . . probable cause").

In this case, the Alexanders – who conducted the seizure of Fisher – had a reasonable suspicion that Fisher was about to commit suicide. They received a dispatch indicating that a man was sitting on the railroad tracks with his feet tied to the tracks. The call also indicated that the man was suicidal. When they arrived on the scene, they saw Fisher sitting on the railroad tracks in a folding chair. Stephen knew that individuals committed suicide in this manner. Although Fisher arose from his chair and began approaching the deputies, they had no way of knowing from their distance if his feet had once been tied to the railroad tracks, as reported. Finally, they noticed that Fisher was carrying a firearm. As in *Bell* and *Wallace*, the fact that Fisher, an allegedly suicidal person with whom they were unfamiliar, was carrying a weapon could reasonably have led the deputies to believe that Fisher was a danger not only to himself but also to others, including the deputies themselves.[3] Therefore, it was permissible for them to detain him temporarily.

The next issue is whether the force used in conjunction with the *Terry* stop was warranted. As the Supreme Court has noted, "Fourth Amendment jurisprudence has long recognized that the right to make an . . . investigatory stop necessarily carries with it with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Whether a particular use of force was within the bounds of the Fourth Amendment depends upon whether it was reasonably necessary under the circumstances. *See id.* at 395-97. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The use of some degree of force will be justified if "the suspect poses an immediate threat to the safety of the officers or others." *Id.* at 396. When necessary to ensure the safety of the officers, such force may include both drawing a weapon and handcuffing the suspect. *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999); *see also United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) ("This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop."). In certain circumstances, officers may be justified in fearing for their own safety when confronting a person they reasonably believe to be suicidal, and in these circumstances the use of the force necessary to neutralize this threat is warranted. *See Wallace*, 889 F.2d at 582 (holding that it was reasonable for police to restrain a suspect in the course of effectuating a *Terry* stop when they had reason to believe he was imminently suicidal and armed); *see also Bell*, 321 F.3d at 639-40 (finding that police officers were justified in using "bean-bag rounds" to take down a man who threatened suicide, in part because of the threat he posed to the officers); *cf. Monday*, 118 F.3d at 1104-05 (finding that police were justified in using pepper spray to seize a suspect they had probable cause to believe was attempting suicide when the suspect was of considerable physical size and refused to hospitalize himself voluntarily).

As with the seizure inquiry, when assessing the reasonableness of the degree of force used by officers in effectuating a *Terry* stop, this court must consider the totality of the circumstances known to the officers prior to the use of force. *See Graham*, 490 U.S. at 397. Importantly, we do

---

[3]It should be noted that in none of the "mental health seizure" cases cited by the majority to support its conclusion that probable cause is the correct standard for evaluating the deputies' conduct did the allegedly suicidal or mentally ill individual carry a firearm. *See Sullivan v. County of Hunt*, 106 Fed. Appx. 215, 217-18 (5th Cir. 2004); *Bailey v. Kennedy*, 349 F.3d 731, 734-35 (4th Cir. 2003); *Glass v. Mayas*, 984 F.2d 55, 55-56 (2d Cir. 1993); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 399 (7th Cir. 1993); *Gooden v. Howard County*, 954 F.2d 960, 962-64 (4th Cir. 1992); *Harris v. Pirch*, 677 F.2d 681, 682-85 (8th Cir. 1982); In re *Barnard*, 455 F.2d 1370, 1372 (D.C. Cir. 1971).

not evaluate the reasonableness of the force actually used "with the 20/20 vision of hindsight" by considering facts of which the officers were unaware but which later came to light. *Id.* at 396.

Here, the deputies were justified in drawing their weapons and in handcuffing Fisher. Upon arriving at the scene, it was reasonable for the deputies to conclude that a man they believed to be suicidal and who was in possession of a firearm posed an immediate threat to their safety. The deputies could reasonably deduce that such an individual would have little regard for the consequences of his actions and might turn the firearm he possessed on them. Hence, it was reasonably necessary for the deputies to draw their weapons on Fisher initially. Even after Fisher placed the firearm visible to the deputies on the ground, their further conduct was warranted. The fact that Fisher possessed one firearm gave the deputies reason to believe that he possessed another. *See United States v. Butcher*, Nos. 92-3987/4011, 1993 WL 272450, at \*7 (6th Cir. July 19, 1993). Moreover, prior to handcuffing Fisher, Stephen Alexander saw ammunition in Fisher's overalls that he believed could have been for another weapon on Fisher's person. That it later became apparent that Fisher did not possess a second firearm is of no moment. Again, as Stephen Alexander stated, the officers were trying to "pat Mr. Fisher down for weapons and ascertain what was going on." At the time the deputies handcuffed Fisher, it was reasonable under the circumstances then known to them to fear that he might suddenly reach for a second firearm and harm them. Consequently, it was also reasonably necessary for them to continue training their weapons on Fisher and to handcuff him in order to guarantee their own safety. The deputies even made sure that the manner in which Fisher was handcuffed did not cause him undue discomfort.

It should also be noted that the temporary detention did not otherwise ripen into an arrest, which would have necessitated probable cause. A *Terry* stop may ripen into an arrest due to the passage of time or due to the nature of the force used to effectuate the stop. *Houston*, 174 F.3d at 814. With respect to the duration of a *Terry* stop, the stop ripens into an arrest if police detain an individual longer than necessary to investigate the suspicious circumstances that led to the original stop. *See United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). The degree of force an officer uses to conduct an investigatory stop must be reasonably necessary to effectuate the stop; otherwise, the stop becomes an arrest. *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003).

In this case, the length of the detention does not demonstrate that the *Terry* stop became an arrest. The detention lasted approximately five minutes, and the deputies were not able to complete their investigation because of Fisher's unfortunate medical emergency. As for the manner in which the deputies conducted the stop, they used no more force than was reasonably necessary. The deputies trained their guns on Fisher only until he was handcuffed, and the handcuffs were necessary to ensure that Fisher, who they reasonably feared was in possession of another firearm, did not harm them. As soon as Fisher became physically distressed and was no longer a potential threat to the deputies, his handcuffs were removed. In other words, in the circumstances of this case, the deputies did not exceed the scope of the initial stop. Rather, their actions were reasonably related to their investigation into whether Fisher was indeed suicidal and were reasonably necessary to ensure their own safety.

In conclusion, the facts of this case do not support the majority's conclusion that Fisher presented evidence sufficient to demonstrate that defendants violated his Fourth Amendment rights. The qualified immunity inquiry should thus end at the first step. While I agree with the majority that the district court did not err in granting summary judgment to Leary and Harden, for the foregoing reasons, I would also affirm the district court's judgment with respect to the Alexanders.