RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0248p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LETICIA RUDOLPH,

*Plaintiff-Appellee*,

*v.*

No. 18-1901

DANIEL T. BABINEC and ROBERT A. ATKINSON, in their individual and official capacities,

*Defendants-Appellants*.

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-00125—Janet T. Neff, District Judge.

Argued: July 31, 2019

Decided and Filed: September 20, 2019

Before: MOORE, COOK, and THAPAR, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** G. Gus Morris, MCGRAW MORRIS P.C., Southfield, Michigan, for Appellants. Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee. **ON BRIEF:** G. Gus Morris, MCGRAW MORRIS P.C., Southfield, Michigan, for Appellants. Amy J. DeRouin, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee.

The court delivered a PER CURIAM opinion in which THAPAR, J., joined in part. THAPAR, J. (pp. 15–18), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

PER CURIAM.  There are two sides to every story.  Here, the two sides read like they come from different books.  What really happened on the night Officers Daniel Babinec and Robert Atkinson seized Leticia Rudolph in her home for a psychiatric evaluation depends on whom you ask.  As Rudolph tells it, the officers violated her rights by seizing and injuring her.  As the officers tell it, they did what any reasonable officer would have done.  Because this is a limited appeal from summary judgment, we must accept Rudolph's version and thus affirm the district court's denial of summary judgment on three of Rudolph's four claims.

## I.    BACKGROUND

Late one night, Leticia Rudolph's ex-husband, Kyle Rudolph, decided to pay her a visit.  Kyle[1] went to check on her after their son had texted him:  "[S]he has the .22 out[,] will you go over there[?]" R. 53-3 (Incident Rep.) (Pg. ID 182).  Rudolph, a single mother, slept with her .22 gun out every night to feel safe.  When Kyle arrived at Rudolph's home, the two spoke for close to an hour about their daughters and their relationship.  Kyle decided to take Rudolph's gun with him as he left, which Rudolph let him do.  After Kyle left, Rudolph went to sleep.  But the night did not end there.

Later, around 3:00 A.M., Officer James Hodges stopped Kyle for speeding.  Kyle admitted he was carrying a gun.  He explained that he took it from his ex-wife earlier that night because he was worried about her.  And Kyle showed Officer Hodges the text message from his son saying Rudolph had her gun out, as well as a text message from Rudolph saying "good bye." R. 53-3 (Incident Rep.) (Pg. ID 182).  Meanwhile, Officer Daniel Babinec arrived at the traffic stop to assist and secure the gun.  Ultimately, the officers let Kyle go with a warning, but they felt obligated to do a wellness check on Rudolph.

---

[1]We mean no disrespect by the use of Kyle Rudolph's first name.  We use it here only to distinguish between Kyle Rudolph and Leticia Rudolph.

Officer Babinec, accompanied by Officer Robert Atkinson, went to Rudolph's home and banged on her doors and windows. She was asleep, so she did not answer. After Officers Babinec and Atkinson informed Officer Hodges that they could not get a response, Officer Hodges followed Kyle into his driveway and told him to call Rudolph. Rudolph answered and stated on speakerphone that she was sleeping, and Officer Hodges told her that his officers were at the door. Rudolph then got up and opened the door. The officers entered without her permission and asked her whether she felt suicidal. Rudolph replied that she was not and felt fine. Rudolph generally cooperated with the officers, but the officers, without much further inquiry, gave her the option of going voluntarily to the hospital or being taken into custody involuntary for a mental-health check.

Then, according to Rudolph, things took a turn. Rudolph says that Officer Babinec grabbed her by the arm without warning, slammed her body and face into the wall, and handcuffed her. She told the officers that the handcuffs were "really tight," and that the officers were hurting her. R. 54-2 (Leticia Rudolph Dep.) (Pg. ID 570). They responded that she was suicidal. The officers then "manhandled" her out of the house, without giving her a chance to put shoes on, and dragged her across her forty-foot driveway. *Id.* (Pg. ID 570–72). Rudolph could not keep up with the officers and asked them to slow down. They did not. Rudolph stumbled and hurt her right ankle—so badly that she would later need two surgeries to treat that injury. She complained repeatedly to Officers Babinec and Atkinson that the handcuffs were too tight, but they did not respond.

Once in the car, Officers Babinec and Atkinson drove Rudolph to the hospital about ten minutes away. The hospital measured her blood alcohol level at .153. The doctor had to wait a few hours for Rudolph's blood alcohol level to go down so he could perform a psychiatric evaluation. When it did go down, the doctor performed the psychiatric evaluation and determined that "[Rudolph] is at extremely low risk of self harm as she does not appear to want to harm herself, has not tried to here and is sober and denies any sort of homicidal or suicidal thought or desire." R. 54-7 (ER Record) (Pg. ID 718); *see also id.* (noting that Rudolph "appears completely sober frankly."). Rudolph was released. She then sued Officers Babinec and Atkinson and Fruitport Township, alleging various constitutional violations.

## II. QUALIFIED IMMUNITY

This case comes to us after the district court denied Officers Babinec and Atkinson's motion for summary judgment.  In this limited appeal, we consider only whether the officers are entitled to qualified immunity.  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  Qualified immunity shields government officials from individual liability if they did not violate a clearly established right "of which a reasonable person" in the same situation would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  At this stage, we decide questions of law, not questions of fact.  The parties continue to disagree over what really happened.  But "we must ignore the defendant[s'] attempts to dispute the facts and nonetheless resolve the legal issue[s] . . . ."  *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018) (internal quotation marks omitted).  In doing so, we accept Rudolph's "version of the facts" and draw all inferences in her favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### A.  Mental-Health Seizure

Rudolph alleges that the officers violated her Fourth Amendment rights when they executed a mental-health seizure.  In denying qualified immunity to Officers Babinec and Atkinson, the district court reasoned that "[t]he general level of uncertainty surrounding the veracity of [Kyle's] account as well as the disparate testimony about Plaintiff's subsequent interaction with the officers are questions of fact bearing on the probable cause issue . . . ."  R. 57 (Dist. Ct. Op.) (Pg. ID 1039).  We agree.  Although the officers had a reason to show up at Rudolph's door for a wellness check, a jury could reasonably find that the officers lacked probable cause when they executed this mental-health seizure.

It is clearly established law "that in the context of a mental health seizure an officer must have probable cause to believe that the person seized poses a danger to [her]self or others." *Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005).  "A showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior."  *Id.* at 843 (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)).  If probable cause exists, a person's denial that they are at risk of suicide does not by itself eliminate that probable cause.  *See Ziegler v. Auckerman*,

512 F.3d 777, 779 nn.1–3, 784 (6th Cir. 2008) (granting qualified immunity even though plaintiff denied making any suicidal comments, and "plaintiff allegedly suffer[ed] from a mental illness that prevent[ed] her from realizing her own need for treatment."). Further discussion of *Fisher* and *Monday* reveals another significant point in the analysis for mental-health seizures: whether a reasonable officer would question the veracity of a suicide report based on the facts at the scene of the wellness check that is done in response to the suicide report.

The *Fisher* court held that the officers lacked probable cause to believe that the plaintiff was a danger to himself or others. 398 F.3d at 843. In that case, an unrelated third party reported that a man had tied himself to railroad tracks and might be attempting to commit suicide. *Id.* When the officers arrived at the scene, however, the facts "would have caused a reasonable officer to question the veracity of the attempted suicide report." *Id.* Among these were the fact that the plaintiff readily complied with the officers' commands to walk toward them, indicating that he was not tied to the railroad tracks; the plaintiff had a hunting rifle, and he complied with the officers' command to drop the gun; the plaintiff was dressed in hunting attire; and the plaintiff exhibited no other suspicious or threatening behavior. *See id.* at 843–44. The officers, meanwhile, "never questioned [the plaintiff] to determine if he might be depressed and attempting to commit suicide." *Id.* at 843. Therefore, although the officers had reason to arrive at the scene based on the attempted-suicide report, once they arrived the facts did not give rise to probable cause to execute a mental-health seizure.

By contrast, in *Monday*, the facts at the scene aligned with the suicide report, and the court held that the officer had probable cause to believe that the plaintiff would harm himself. 118 F.3d at 1102. There, an officer responded to a report from a third-party mental-health professional that the plaintiff may have been at risk of injuring or killing himself. *Id.* at 1101–02. The report indicated that the plaintiff "was upset over a divorce and had ingested some pills and was drinking alcohol in an effort to commit suicide." *Id.* at 1102. Then, upon arrival, the officer observed that "plaintiff in fact was drinking alcohol and appeared intoxicated and depressed. A count of his Xanax pills by the officer[] revealed that at least twenty were missing." *Id.* Based on these facts at the scene, the officer could reasonably conclude that "an

unacceptable risk remained that plaintiff was deceiving him in order to attain his apparently declared goal of committing suicide." *Id.* at 1103 (collecting cases).

This case falls more on the *Fisher* side of the line. A review of the facts provides a basis for the officers to have arrived at Rudolph's house to check on her. Upon arrival, however, the totality of the circumstances "would have caused a reasonable officer to question the veracity of the attempted suicide report." *Fisher*, 398 F.3d at 843. Or at least a jury could see this case that way, and consequently a jury reasonably could determine that the officers lacked probable cause.

We start with the traffic stop of Rudolph's ex-husband. Officer Hodges pulled over Kyle for speeding, and he then observed that Kyle exhibited some signs of intoxication. When Officer Hodges asked Kyle to step out of the vehicle for sobriety tests, Kyle then pulled out the .22 caliber pistol and said he took it from his ex-wife and that she was intoxicated. Importantly, there is a question of fact whether Kyle stated that Rudolph was suicidal,[2] and there is no evidence that Kyle requested the officers to check on Rudolph. *See, e.g.*, *Fisher*, 398 F.3d at 843 (a third party called the police to report a suspected suicidal person); *Monday*, 118 F.3d at 1101–02 (same); *Gooden v. Howard County*, 954 F.2d 960, 967 (4th Cir. 1992) (en banc) (same). Kyle also showed Officer Hodges some ambiguous text messages. R. 53-3 (Incident Rep.) (Pg. ID 182) (noting a 1:06 AM text stating "good bye," and a text from Rudolph's son stating "she has the .22 out will you go over there"). To be sure, a reasonable officer would have some reason to be concerned about Leticia Rudolph given these facts—mainly, the son's text and her alleged intoxication. But a reasonable officer also would have thought that it is possible the ex-husband was trying to use his ex-wife to get out of his receiving a ticket. After all, in cases like *Monday* and *Fisher* (and many others), someone affirmatively requested the police to check on the potentially suicidal person; here, however, an ex-husband (not a current spouse) made no such

---

[2]*Compare* R. 53-3 (Incident Rep.) (Pg. ID 182) (noting Kyle said that Rudolph was suicidal), *with* R. 54-3 (Kyle Rudolph Dep.) (Pg. ID 619) (Kyle testifying that he does not remember whether he said that Rudolph was suicidal), *id.* (Pg. ID 628–29) ("I really just wanted to go back home and go to bed, so. . . . You know, she was intoxicated and so I just was going to take [the gun] and go home."), *and id.* (Pg. ID 644) (Q: "Do you recall ever recommending at any point during the conversation that you should take her to the hospital [be]cause you were concerned for her life?" A: "No."). *See also* R. 57 (Dist. Ct. Op.) (Pg. ID 1039) ("The general level of uncertainty surrounding the veracity of [Kyle's] account as well as the disparate testimony about Plaintiff's subsequent interaction with the officers are questions of fact bearing on the probable cause issue, and the function of the district court is not to determine the truth of the matter.").

request, and he did not reveal that his ex-wife was supposedly suicidal until *only after* he himself had a run-in with the police.

Then Officers Babinec and Atkinson drove to Rudolph's house because of their concern for her wellbeing. They knocked on the door, but no one responded (and recall, it is after 3:00 A.M. at this point). So the officers contacted Officer Hodges, who had followed Kyle back to his residence, to have Kyle call Rudolph. Kyle complied, and once Rudolph answered, Kyle handed the cellphone, which was on speaker phone, to Officer Hodges. Rudolph stated that she was sleeping. (Yet Officer Hodges apparently failed to mention this fact to Officers Babinec and Atkinson.) At this point, one begins to realize it is likely that Rudolph simply got drunk and fell asleep after Kyle left, and Rudolph perhaps did something dumb if she drank alcohol while cleaning her gun—but that is a far cry from being suicidal.

The phone call succeeded in getting Rudolph to answer the door, at which point Officers Babinec and Atkinson immediately entered her home without her permission. *See* R. 54-5 (Babinec Dep.) (Pg. ID 693–94). The officers observed that Rudolph in fact appeared to be intoxicated, but she denied being suicidal and stated that she was cleaning her gun. The record does not indicate that the officers otherwise asked Rudolph whether she attempted to harm herself without the gun (perhaps with a knife or pills), why she did not answer the door, why her son might have been concerned about her, or whether she had kids in the house, nor did they ask if they could breathalyze her. Indeed, the record is devoid of any mention from the officers that they thought Rudolph might overdose on drugs or have drunk alcohol to the point of risking death. *See Simon v. Cook*, 261 F. App'x 873, 880 (6th Cir. 2008) ("Unlike the officers in *Fisher*, [the officer in this case] questioned and observed [plaintiff] at length."); *Monday*, 118 F.3d at 1102–03; *Harris v. Pirch*, 677 F.2d 681, 689 (8th Cir. 1982) (based on the fact that plaintiff had been recently hospitalized, was upset when the officer arrived, and showed the officer a partially empty bottle of pills, the court held the officer "had reasonable cause to believe that [plaintiff] had attempted to overdose.").

The officers thus apparently executed this mental-health seizure because they determined that Rudolph's intoxication alone provided support for her ex-husband's alleged assertion that she was suicidal. *See, e.g.*, R. 54-4 (Atkinson Dep.) (Pg. ID 674). That is an unreasonable

logical leap. *Cf. People v. Triplett*, 192 Cal. Rptr. 537, 541 (Cal. Ct. App. 1983) (defendant's "intoxication and weeping standing alone would not justify detention under [a California statute]," but the officer had probable cause to detain a woman because of "these symptoms coupled with obvious physical signs of a recent suicide attempt"), *accord Gooden*, 954 F.2d at 967 (holding that officers were entitled to qualified immunity when a woman was screaming and whose condition had caused another person to twice call the officers to the scene). Given the totality of the circumstances, Rudolph's intoxication standing alone cannot provide a basis to support her ex-husband's supposed statement that she was suicidal.

Without any further evidence at the scene of the wellness check or inquiry into whether Rudolph tried to harm herself, the officers therefore lacked probable cause to execute this mental-health seizure. It is undoubtedly dangerous for a person to clean her gun while drinking an excessive amount of alcohol, and if Rudolph had been doing that when the officers arrived, then they would have probable cause to believe that Rudolph was a danger to herself. But everyone in this case was concerned *only* about the gun, which had been taken away from Rudolph.[3] Once the danger—i.e., the gun—was removed from the equation, there was no longer an unacceptable risk of Rudolph harming herself. Unless, of course, she exhibited suicidal behavior. But without the gun, what is left to support probable cause at the scene of the wellness check that Rudolph was suicidal? Based on this record and in the light most favorable to the plaintiff, we do not see much of anything.

Critically, the "touchstone of the Fourth Amendment is reasonableness. But this standard does not become more forgiving as the quality of evidence (or of police work) decreases." *King v. United States*, 917 F.3d 409, 426 (6th Cir. 2019) (internal quotation marks and citation omitted). "Rather, as the" alleged assertion by an ex-husband that his ex-wife is suicidal "becomes less reliable . . . an officer's reliance on that [assertion] becomes objectively *less* reasonable and *less* likely to support a" mental-health seizure. *See id.* That was the case here, as

---

[3]*See* R. 54-3 (Kyle Rudolph Dep.) (Pg. ID 628–29); *id.* (Pg. ID 619); *id.* (Pg. ID 644); R. 54-4 (Atkinson Dep.) (Pg. ID 673–74) (stating that "given the time of the . . . night . . . it seemed a little out of the ordinary [to be cleaning a gun]," and that there were no other statements on the scene that would indicate Rudolph needed to be taken in for a mental-health exam); *id.* (Pg. ID 674) (Q: "Other than that, any other statements?" A: "Just the odor of intoxicants that I got from her during her statement."); R. 54-5 (Babinec Dep.) (Pg. ID 693) (Q: "Were you concerned that she had other weapons?" A: "Wasn't really a thought.").

it was similarly the case in *Fisher*: As the events unfolded, the officers' reliance on the initial attempted-suicide report became less reasonable—so much so that a jury could reasonably conclude that a reasonable officer lacked probable cause to support the mental-health seizure. *See Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019) (explaining that "just because we must look at the circumstances through the eyes of a reasonable officer does not mean . . . that we must accept the officers' subjective view of the facts when making this assessment. Given the interlocutory nature of this appeal, rather, we must conduct the reasonable officer analysis using the facts in the light most favorable to plaintiff.").

The district court questioned Kyle's credibility in this case, and a reasonable officer would certainly have reason to be at least a little suspicious of his assertions. Moreover, Rudolph did not otherwise exhibit any signs during the wellness check that would provide an arguable basis to confirm the alleged assertion that she was suicidal. Individuals become intoxicated late at night in their own homes all the time. Put simply, that alone cannot provide a basis for a mental-health seizure. All that remains are Rudolph's ex-husband's statements and a text from her son that he is concerned about a gun (which had been removed). Once the officers arrived, however, they were apparently there for the sole purpose of executing a mental-health seizure (not to determine whether she was going to harm herself), and there are no circumstances that could have changed their decision to seize Rudolph. Based on the circumstances at least, a jury could see it that way.

Finally, the officers were under no legal duty to intervene, *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196–97 (1989), though the law surrounding mental-health seizures encourages them to do so. Once officers decide to intervene, however, certain constitutional requirements kick in—in this case, the officers needed probable cause to believe a person was suicidal. Although qualified immunity grants officers leeway for mistakes on probable-cause determinations, based on the facts of this case, the probable-cause question is better left to the jury.

Officers Babinec and Atkinson are not entitled to qualified immunity on this claim.

**B. Handcuffing**

Rudolph alleges that the officers used excessive force when they handcuffed her too tightly. The Fourth Amendment prohibits excessive force when arresting someone, which includes "unduly tight handcuffing." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005); *Walton v. City of Southfield*, 995 F.2d 1331, 1342–44 (6th Cir. 1993), *superseded by statute on other grounds as recognized in Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407–08 (6th Cir. 2007). Rudolph demonstrated the three elements needed to make out an excessive-handcuffing claim: (1) she complained that the handcuffs were too tight, (2) the officers ignored her complaints, and (3) she suffered "some physical injury" from the handcuffing. *Miller v. Sanilac County*, 606 F.3d 240, 252 (6th Cir. 2010) (citation omitted). And a reasonable officer would have known that Rudolph had a clearly established right not to be subject to excessive handcuffing. *See, e.g.*, *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401–04 (6th Cir. 2009). So Officers Babinec and Atkinson are not entitled to qualified immunity from this claim.

The officers, however, argue that *Miller* demonstrates that even under Rudolph's version of the facts, they did not violate clearly established law. But *Miller* is inapposite. There, the plaintiff did not complain about the tightness of the handcuffs until he arrived at the jail, at which point the handcuffs were removed. *Miller*, 606 F.3d at 252. Here, Rudolph alleges that she complained when Officers Babinec and Atkinson first put on the handcuffs, continued to complain on the way to the hospital, and stopped complaining only when the officers finally removed the handcuffs. At this stage, we must accept Rudolph's testimony, so *Miller* is distinguishable.

Officers Babinec and Atkinson also argue that the handcuffs were on Rudolph for too little time to constitute excessive force—in other words, as a matter of law, Rudolph has nothing to complain about. The officers propose a bright line rule: ten minutes of handcuffing is not long enough for excessive force. And in a prior case, albeit unpublished, we noted that simply complaining during a ten-minute car ride was not enough to state a claim. *Fettes v. Hendershot*, 375 F. App'x 528, 533–34 (6th Cir. 2010). But *Fettes* did not set a bright-line rule. Instead, it noted that during a short trip, where officers adhere to police protocol and act reasonably, they cannot be held liable. *Id*. Conduct, not time, is the measurement of a violation. To see why,

imagine that someone was handcuffed so tightly that she was bleeding from her wrists and screaming in pain while an officer ignored the complaint. The law would not require us to ignore that excessive force claim because the bleeding went on for ten minutes instead of eleven. Rather than specific time limits, what matters in an excessive force claim is whether the *Miller* requirements—complaint, ignoring of complaint, and injury—are met, and whether the officers acted reasonably in the circumstances. 606 F.3d at 252; *see also Graham v. Connor*, 490 U.S. 386, 388 (1989) (noting that all excessive force claims must be considered under an "objective reasonableness" standard).

In any case, Rudolph says she was handcuffed for longer than ten minutes. The officers say Rudolph "acknowledged that she was only handcuffed for 10 minutes." Appellant Br. at 18. Not so. Rudolph acknowledges that the *drive to the hospital* lasted ten minutes. But she alleges she was handcuffed before the ride to the hospital, and the handcuffs were not removed until after she got there—she says the total time was thirty minutes. To back up this claim, she notes that the officers arrived at her house at 3:24 A.M., and she was seen at the hospital at 3:54 A.M. So even if Officers Babinec and Atkinson *were* right that ten minutes in handcuffs is too short as a matter of law, Rudolph alleges that she was handcuffed for longer. And at this stage of the proceedings, we accept her version of the facts as true. *See Scott*, 550 U.S. at 378. Under that version of the facts, Rudolph told the officers the handcuffs were too tight and that they were hurting her, and the officers "[d]idn't say anything at all[.]" R. 54-2 (Leticia Rudolph Dep.) (Pg. ID 571). In fact, no one ever adjusted the handcuffs. So the officers violated Rudolph's clearly established right to be free from too-tight handcuffing by unreasonably ignoring her repeated complaints.

Finally, Officers Babinec and Atkinson say that Rudolph has failed to provide enough evidence to prove that they violated her right against excessive handcuffing. According to them, Rudolph provided only a "subjective assessment" of her injury. Appellant Br. at 16–18. They are incorrect. True, a subjective recounting of pain without some corroboration is not enough. *See Miller*, 606 F.3d at 252. But Rudolph provided photos she took one day after the incident, showing the injuries on her hands, wrists, and arms. And a picture is often worth a thousand

words.  The pictures coupled with her testimony suffice at this stage to withstand a qualified immunity challenge.

### C.  Other Excessive Force

Rudolph also alleges that the officers used excessive force when they pushed her against the wall and dragged her to the police car.  The right to be free from excessive force during an arrest is clearly established.  *Kostrzewa v. City of Troy*, 247 F.3d 633, 641–42 (6th Cir. 2001).  But not every use of force violates the Constitution.  Police officers may "use some degree of physical coercion or threat thereof to effect [an arrest]."  *Id.* at 639 (citation omitted).  That force must be objectively reasonable, judged "from the perspective of a reasonable officer on the scene."  *See Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (citation omitted); *see also Kostrzewa*, 247 F.3d at 639 (explaining that the force should be considered in the context of the arrest scene, not "the peace of a judge's chambers" (citation omitted)).  The Supreme Court has urged "careful attention to the facts and circumstances of each particular case" but noted two factors to guide our inquiry:  (1) "whether the suspect poses an immediate threat to the safety of the officers or others," and (2) "whether [she] is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

Officers Babinec and Atkinson argue that, even taking the facts as Rudolph alleges them, their use of force was objectively reasonable.  They provide four reasons why that is so:  (1) they believed Rudolph was intoxicated; (2) she did not answer the door when they first knocked between 3:00 A.M. and 4:00 A.M.; (3) she denied being suicidal; and (4) she moved away from Officer Babinec when he first tried to handcuff her.

Those reasons are not enough.  The officers are asking us to weigh their evidence over Rudolph's.  This we cannot do.  Construing the facts in Rudolph's favor, the officers slammed her face and body into a wall, pulled her out of her house, and dragged her down a long driveway so roughly that she needed multiple surgeries.  And all this even though she alleges that she complied with their orders, was not attempting to flee, and in that moment posed no apparent threat to herself or others.  Our court has found excessive force in analogous cases.  *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 173–75 (6th Cir. 2004) (denying qualified immunity

for excessive force claim where officers tried to knock a woman down with a leg sweep, shoved her against a display case, and yanked her arm so hard it fractured—even though she was compliant). In *Solomon*, the plaintiff even "admitted that she pulled her arms together as the officers seized her to avoid the officers' attempt to handcuff her," *id.* at 176 (Rogers, J., dissenting), while Rudolph denies anything of the sort. The officers are not entitled to qualified immunity.

## III.    STATE-LAW CLAIMS & MICHIGAN GOVERNMENTAL IMMUNITY

Rudolph alleges that the officers violated Michigan state law when they seized her and took her involuntarily to the hospital. The district court denied the officers immunity under Michigan law. Our court has held that a denial of Michigan governmental immunity may be immediately appealed. *Kindl v. City of Berkley*, 798 F.3d 391, 403 (6th Cir. 2015); *Smith v. County of Lenawee*, 600 F.3d 686, 689 (6th Cir. 2010) ("[T]his court has consistently . . . allowed interlocutory appeals to be taken from orders granting or denying governmental immunity under [Mich. Comp. Laws] § 691.1407."). So we review the denial de novo and, as above, draw reasonable inferences in favor of Rudolph. *Kindl*, 798 F.3d at 403.

The district court applied the wrong legal standard when it analyzed this claim. The district court resolved this claim based on the lack of objective probable cause for Rudolph's mental-health seizure. But since Rudolph brought these claims under Michigan law, the usual objective reasonableness standard is not relevant here. Though federal law usually examines whether the officers had probable cause or reasonably could have believed that they did, Michigan law asks a different question: whether the arrest was "undertaken in good faith, or w[as] not undertaken with malice . . . ." *Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008). Thus, the question is whether the officers showed "malicious intent, capricious action or corrupt conduct" or "conduct or a failure to act that was intended to harm the plaintiff [or] . . . that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Id.* at 225 (citation and internal quotation marks omitted).

Rudolph has not alleged such malice. Instead, she rests her argument on the lack of probable cause, further arguing that the officers were "blatantly indifferent" to that fact.

Appellee Br. at 41–42; *id.* at 41 ("Defendants-Appellants still unlawfully and falsely arrested Plaintiff-Appellee and transported her to a hospital for an unnecessary medical evaluation against her will though she had committed no crimes and did not pose an immediate threat of danger to herself or others."). But the absence of probable cause does not automatically lead to malice, and Rudolph alleged no facts to support her bare conclusion that the officers acted with malice. The closest Rudolph comes to showing bad faith is pointing to Officer Babinec's testimony that he never inquired if there were any other weapons in Rudolph's home, and he admitted that it was not a concern to him at the time. This failure to inquire further does not rise to the level of "wantonness or a reckless indifference to the common dictates of humanity." *Odom*, 760 N.W.2d at 225 (emphasis omitted) (quoting *Firestone v. Rice*, 38 N.W. 885, 888 (Mich. 1888)). Thus, we reverse the district court's denial of Michigan governmental immunity.

## IV.    CONCLUSION

We **AFFIRM** the district court's denial of summary judgment on Rudolph's claims of an unlawful mental-health seizure, excessive force for too-tight handcuffing, and excessive force during the seizure. We **REVERSE** the district court's denial of summary judgment on Rudolph's state-law claim of false arrest and imprisonment.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

THAPAR, Circuit Judge, concurring in part and dissenting in part. To get the right answer, we must ask the right question. For qualified immunity, the right question is not whether Officers Babinec and Atkinson took the best possible course of action when they brought Leticia Rudolph to the hospital for a mental health evaluation. The right question is not even whether they were *correct* to fear that Rudolph might harm herself. Instead, the right question is whether the officers were "plainly incompetent" in fearing that Rudolph might harm herself. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). They were not.

Though the parties tell different stories, the core facts underlying the seizure are uncontested. The officers pulled Kyle Rudolph over for speeding. He admitted to carrying a gun and told the officers that he took the gun from Rudolph "so she wouldn't harm herself." R. 53-4, Pg. ID 204. The officers also recall him saying that Rudolph was suicidal.[1] Kyle Rudolph then showed Officer Hodges text messages from both Rudolph's son and Rudolph herself suggesting she might be at risk. Finally, the officers found Rudolph intoxicated. So the officers knew that (1) close family members were worried that Rudolph might harm herself, (2) one family member was so worried that he had taken away Rudolph's registered weapon at the request of another concerned family member, and (3) Rudolph was intoxicated. Given these facts, an officer in the field could have reasonably concluded that Rudolph might harm herself.

The law is also clear. First, we must view these facts in totality, not in isolation. *See Wesby*, 138 S. Ct. at 588–89. It is all too easy to "identif[y] innocent explanations" for specific facts. *Id.* at 589. But this kind of "divide-and-conquer approach is improper." *Id.* Second, when it comes to probable cause, we deal in "probabilities," not certainties. *Id.* at 586

---

[1]Although Kyle Rudolph does not recall saying that Rudolph was suicidal, that is of no moment for summary judgment purposes. A mere memory lapse does not discredit the officers' testimony; Rudolph cannot "beat something with nothing." *Wysong v. City of Heath*, 260 F. App'x 848, 858 (6th Cir. 2008). And even if Kyle's forgetfulness cast doubt on the officers' story, it would not matter because "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984)).

("Probable cause is not a high bar." (internal quotation marks omitted)). And third, we are ultimately trying to determine whether, given the undisputed facts, the officers were "plainly incompetent" when they concluded that Rudolph might harm herself. *Id.* at 589. They were not.

The majority missteps because it takes undisputed facts—the texts—and construes them in isolation and in a particular light. But if facts are undisputed, the question is not whether *we* can think of an alternative, innocent explanation. The question is whether *any reasonable officer* could draw a different inference without crossing into plain incompetence. *See id*. at 587 (asking whether "[a] reasonable officer could infer" a conclusion from the undisputed facts). Take Rudolph's text "Good bye." No one disputes the officers saw it. Rather, the dispute is how a reasonable officer could understand those words given the circumstances. Could they construe it as good riddance? Sure. But was it *unreasonable* for the officers to worry the text meant goodbye forever? No. Given the information known to the officers—that Rudolph's gun had been confiscated, that her own son was concerned, and that her ex-husband told the officers that Rudolph might harm herself—the officers were not plainly incompetent to err on the side of caution.

In addition, while intoxication alone means little, it means much more given the surrounding facts. *Id.* at 588 ("Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation."). No one can dispute that intoxicated people make detrimental choices they otherwise would not make if they were sober. So the officers were surely reasonable in concluding that Rudolph's intoxication heightened the risk of harm.

Nor does it matter that the officers relied on family members rather than a medical professional to determine that Rudolph was at risk. Officers do not have the luxury of consulting a mental health professional when they are deciding whether to take someone to a *mental health professional*. *See, e.g.*, *Simon v. Cook*, 261 F. App'x 873, 874, 877, 881 n.4 (6th Cir. 2008). After all, the officers took Rudolph to see a medical professional, not to jail.

Qualified immunity grants police officers leeway to exercise reasonable judgment. Sometimes that judgment will mean the difference between life and death. For this reason, the

Supreme Court has "stressed that the specificity of the [clearly established] rule is especially important in the Fourth Amendment context." *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted). In Fourth Amendment cases, it is especially difficult for an officer to apply the relevant legal doctrine to the ongoing situation in front of him. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Thus, the Supreme Court has repeatedly "stressed the need to identify *a case* where an officer act[ed] under similar circumstances" and was found to violate the Fourth Amendment. *Wesby*, 138 S. Ct. at 590 (emphasis added) (internal quotation marks omitted).

The Majority Opinion has not identified such a case. It notes instead that this case "falls more on the *Fisher* side of the line." Majority Op. at 6 (citing *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005)). That is a far cry from identifying a specific case with similar circumstances that would give an officer fair notice. *Wesby*, 138 S. Ct. at 590; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (warning courts "not to define clearly established law at a high level of generality"; what matters is "whether the violative nature of *particular* conduct is clearly established" (emphasis added)). But even if falling more on one side of a line were enough, I respectfully disagree that this case is like *Fisher*. In *Fisher*, an unrelated passerby called the police because they thought a man 250 yards in the distance might be attempting suicide by tying himself to the railroad tracks. *Fisher v. Harden*, 398 F.3d 837, 840 (6th Cir. 2005). Because the tip lacked veracity, this circuit held the officers did not have probable cause for a mental health seizure. *Id.* at 843. Here, by contrast, the concern came not from a random passerby far in the distance, but from two family members who knew Rudolph very well, including her own son. A reasonable officer would not have read *Fisher* to prohibit reliance on concern from family members. *See Wesby*, 138 S. Ct. at 590; *al-Kidd*, 563 U.S. at 742. So it did not provide fair notice to the officers here.

Courts must remember that law enforcement officers must protect the public in an uncertain and dangerous world, not the cold crucible of the courtroom. *See City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015); *Cole v. Carson*, No. 14-10228, 2019 WL 3928715, at *22 (5th Cir. Aug. 21, 2019) (en banc) (Ho, Oldham, JJ., dissenting) (noting that most judges have not experienced the real-world difficulties of policing). In that world, officers don't have time to debate whether the emergency in front of them falls "more on [one] side of

the line" of precedent than another. Majority Op. at 6. Indeed, the specificity requirement of qualified immunity protects officers from this very paralysis by analysis. As the Supreme Court repeatedly reminds us, "[a] rule is too general if the unlawfulness of the officer's conduct does not follow *immediately.*" *Wesby*, 138 S. Ct. at 590 (emphasis added) (quotation marks and citations omitted). In short, the rule must "obviously resolve whether the circumstances . . . constitute[d] probable cause." *Id.* The majority's "which side of the line rule" simply does not.

One need only consider some examples to see the importance of this point. Imagine the police receive a tip from a man's ex-wife and daughter saying they confiscated his weapons because they feared he would commit a mass shooting. His family members were worried about his mental state and believed him to be at risk of violence. Surely the police should not refrain from taking the man in for a mental health evaluation just because the concern came from family members alone. Or imagine that a man's children tell police officers on the street that they are worried their father might hurt their mother because he is having flashbacks that cause him to lash out violently. When the officers arrive at the home, they find the man intoxicated, though he denies that there is any problem. Should the officers really take a chance in that situation? Qualified immunity exists to insulate these difficult judgment calls. We would all be ill-served if it did not.

I fear we have placed officers in an untenable catch-22. No doubt, if the officers here had failed to act and were wrong, they would have faced significant criticism and personal guilt. Maybe even legal consequences. Qualified immunity does not enforce a regime of "damned if they do, damned if they don't." Just the opposite. It protects reasonable but mistaken judgment calls made in extremely difficult situations. Because the officers could have reasonably believed that they had probable cause for a mental health seizure under these facts, they should receive qualified immunity. Thus, I respectfully dissent from the denial of qualified immunity for the mental health seizure and concur on all other issues.